## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DISTRICT OF COLUMBIA

| | |
|---|---|
| CEPHALON, INC.,<br>41 Moores Road<br>Frazer, PA 19355,<br><br>    Plaintiff,<br><br>    v.<br><br>KATHLEEN SEBELIUS, in her official capacity as<br>SECRETARY, DEPARTMENT OF<br>HEALTH AND HUMAN SERVICES<br>200 Independence Ave., S.W.<br>Washington, D.C. 20201,<br><br>and<br><br>MARGARET HAMBURG, M.D.,<br>in her official capacity as<br>COMMISSIONER, FOOD AND<br>DRUG ADMINISTRATION,<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

Plaintiff Cephalon, Inc. ("Cephalon"), by its undersigned counsel, hereby brings

this Complaint against Defendants Kathleen Sebelius, solely in her official capacity as Secretary

of the Department of Health and Human Services ("HHS"), and Margaret Hamburg, M.D., solely

in her official capacity as Commissioner of Food and Drugs, head of the Food and Drug

Administration ("FDA" or the "agency"), and alleges as follows:

1.     This is an action to require FDA to revoke the approval of a potentially dangerous drug.  In particular, FDA recently approved an application sponsored by Watson Laboratories, Inc. ("Watson") to market what Watson claimed was a generic version of Cephalon's brand name drug, FENTORA® (fentanyl citrate) (hereinafter, "FENTORA"), even though there is unrebutted evidence before the agency showing that the Watson product contains a novel salt form of the active ingredient in FENTORA.  FDA's approval was contrary to the statutory requirement that a generic applicant must provide FDA with "information to show that the active ingredient of the new drug is the same as that of the [approved brand name] drug."  21 USC 355(j)(2)(A)(ii).  In this case, FDA went beyond the plain language of the statute, and broke from a long line of agency precedent, by making a judgment that the new salt form of the drug, if present in the generic product, would not adversely affect "product performance."  No such judgment is permitted under the law.  The generic product must have the same active ingredient as the approved brand name drug, in the same chemical form, to be eligible for approval under the generic drug statute.  Second, FDA went beyond the statute and precedent when it determined that the risk that the new salt is present in the generic product is "at an acceptable minimum."  Again, the statute that governs this case does not permit FDA to make a risk-based determination.  The proposed generic must be shown – affirmatively – to contain the same drug as the approved pioneer, and only the same drug.  Finally, unrebutted evidence before the agency shows that the generic in fact contains significant amounts of the novel salt, making the agency's decision in this case arbitrary, capricious, and contrary to law.

2.     FENTORA is a potent drug approved to treat breakthrough pain in cancer patients.  FENTORA's sole active ingredient is a very specific version of fentanyl, an

extraordinarily potent painkiller that is regulated in the United States as a Schedule II narcotic. Cephalon has provided FDA with evidence that Watson's product contains two active ingredients, the one in FENTORA and a different variant or "salt" of fentanyl that has never before been approved by the FDA. By statute, generics must have the same active ingredients, and the evidence demonstrates that Watson's does not. Simply stated, as a matter of law, the very presence of the differing salt renders the Watson product ineligible for approval through an ANDA. 21 U.S.C. § 355(j)(2)(A)(ii)(I). As a result, both FDA's decision to deny the Cephalon Citizen Petitions and to approve Watson's ANDA are contrary to law, arbitrary, capricious, abuses of discretion, and otherwise violate the Administrative Procedure Act (the "APA").

3. FDA also acted in violation of the statutory mandate that a proposed generic must be shown to release the same amount of drug, at the same rate, as the pioneer drug. 21 U.S.C. § 355(j)(8). This "bioequivalence" requirement, when properly applied, ensures that patients obtain exactly the same relief with the generic as they would with the pioneer. FDA acted improperly here by failing to require a showing of bioequivalence during the first 30 minutes of therapy. FENTORA is specifically approved by FDA based on the product's demonstrated ability to provide pain relief within 30 minutes of a cancer pain episode.

4. Watson currently is barred from bringing its product to market by an injunction that was issued in a separate patent case filed by Cephalon in the United States District Court for the District of Delaware. However, the patent court recently ruled in Watson's favor on two of the three patents and may rule imminently on the remaining patent at issue. If the patent case is resolved in Watson's favor, Cephalon will be forced to solicit this Court's

3

assistance in issuing a TRO and PI to prevent Watson from bringing its drug to market before resolution of the administrative law issues raised in this case.

## PARTIES

5.     Plaintiff Cephalon, Inc. is a Delaware corporation with its principal place of business at 41 Moores Road, Frazer, PA 19355.  Cephalon holds an approved New Drug Application, No. 21-947, for FENTORA.

6.     Defendant Kathleen Sebelius is the Secretary of HHS and is responsible for administering and enforcing the Food, Drug, and Cosmetic Act, 21 U.S.C. § 321, et seq. Defendant Sebelius is being sued in her official capacity only.  Defendant Sebelius maintains an office at 200 Independence Avenue, S.W., Washington, D.C. 20204.

7.     Defendant Margaret Hamburg, M.D., is the Commissioner of Food and Drugs and is responsible for supervising the activities of FDA, an administrative agency within HHS. Defendant Hamburg is being sued in her official capacity only.  Defendant Hamburg maintains offices at 10903 New Hampshire Avenue, Silver Spring, MD 20993.

## JURISDICTION AND VENUE

8.     Jurisdiction in this Court is grounded upon and proper under 28 U.S.C. § 1331 in that this is a civil action arising under the laws of the United States; 28 U.S.C. § 1346 in that this case involves claims against the federal government; 5 U.S.C. § 702 in that Cephalon is seeking judicial review of an agency action from which it has suffered a legal wrong, has been adversely affected, and has been aggrieved; 28 U.S.C. § 1361 in that this is an action to compel an officer of the United States to perform his duty; 28 U.S.C. §§ 2201-2202 in that there exists between Cephalon and the Defendants an actual, justiciable controversy as to which Cephalon

4

requires a declaration of its rights by this Court as well as preliminary and permanent injunctive relief to prohibit the Defendants from violating laws and regulations; and 21 U.S.C. § 355(q) and other sources of law in that the conduct complained of constitutes final agency action.

9.   Venue is proper in this Court under 28 U.S.C. § 1391(b) and (e) because this is a civil action in which the Defendants are officers of the United States acting in their official capacities and one of the Defendants maintains her office and conducts business in this judicial district.  Moreover, a substantial part of the events giving rise to the claims herein occurred within this judicial district.

10.   Cephalon has standing to bring the present lawsuit because it is suffering and faces actual injury as a result of FDA's decisions and because it is within the zone of interest of the relevant statutory provisions.

## NATURE OF THE CASE

1. **Process for FDA Approval of Generic Drugs:**

11.   The Food, Drug, and Cosmetic Act ("FDCA") requires all new prescription drugs to obtain FDA approval under a new drug application ("NDA") before they are permitted to enter the marketplace.  21 U.S.C. § 355(a), (b).  Brand name or "pioneer" drug manufacturers must demonstrate the safety and effectiveness of their products by conducting numerous pre-clinical and clinical studies.  See 21 U.S.C. § 355(b)(1).

12.   Generic manufacturers, by contrast, may seek FDA approval by showing that they are the same as the approved pioneer under an abbreviated new drug application ("ANDA").  See 21 U.S.C. § 355(j).

13.     Among other things, where the pioneer drug contains a single active ingredient, an ANDA must show that "the active ingredient of the new drug is the same as that of the listed drug." 21 U.S.C. § 355(j)(2)(A)(ii)(I).  This requirement is fundamental to the very notion of a "generic version" of a drug, and by statute it is mandatory and cannot be waived by FDA – the agency cannot lawfully approve an ANDA if the proposed generic drug contains a different active ingredient from that of the pioneer.  Id.

14.     In addition, a proposed generic drug must be shown to be bioequivalent ("BE") to the pioneer drug.  21 U.S.C. § 355(j)(2)(A)(iv).  A generic drug is considered bioequivalent to the pioneer if:

> [T]he rate and extent of absorption of the [proposed generic] drug do not show a significant difference from the rate and extent of absorption of the [reference] drug when administered at the same molar dose of the therapeutic ingredient under similar experimental conditions in either a single dose or multiple doses…

21 U.S.C. § 355(j)(8)(B)(i).

15.     For a drug like FENTORA that is intended to deliver the active ingredient into the bloodstream, the rate and extent of absorption of the drug can be measured directly in the bloodstreams of healthy human subjects.  21 C.F.R. § 320.24(b)(1)(i).

## 2.  FENTORA®

16.     Cephalon's drug, FENTORA, is a potent opioid analgesic that was first approved by FDA on September 25, 2006.  The drug is indicated for the management of breakthrough pain in patients with cancer who are already receiving (and have become tolerant to) around-the-clock opioid therapy for their persistent cancer pain.

17.     FENTORA's active ingredient is fentanyl citrate, which is regulated in the United States as a Schedule II narcotic.  FENTORA is formulated as a tablet, to be placed under

6

the patient's cheek for a sufficient period of time to allow disintegration of the tablet and

absorption of fentanyl through mouth tissues.  Cephalon's clinical studies have demonstrated that

FENTORA begins to have a clinical effect on pain in as little as 15 minutes, and that

FENTORA's rapid onset provides meaningful relief to patients suffering from breakthrough

cancer pain within 30 minutes.

### 3.  Watson's ANDA and the Subsequent Patent Infringement Lawsuit

18.    On July 10, 2007, Watson submitted an ANDA seeking permission to

market and sell a proposed generic version of FENTORA.  After Watson notified Cephalon of its

intention to seek FDA approval prior to the expiration of Cephalon's patent rights, Cephalon

filed patent infringement claims against Watson in the District Court for the District of Delaware

challenging certain aspects of Watson's manufacturing methods.  See Cephalon, Inc. v. Watson

Pharmaceuticals, Inc., Civil Action Nos. 08-330, 09-724 (SLR) (referred to collectively herein as

the "patent lawsuit").

19.    Certain materials disclosed in the patent lawsuit revealed that the Watson

product contains two active ingredients, not one, and that one of them is a fentanyl salt not found

in FENTORA.  These documents showed that after Watson submitted its ANDA, FDA

expressed concerns that the wet granulation manufacturing process used by Watson presented the

opportunity for FENTORA's active ingredient, fentanyl citrate, to react with an inactive

ingredient in the Watson product (sodium starch glycolate) to form a new fentanyl salt (fentanyl

starch glycolate).  As noted in an FDA Contact Report drafted by Watson personnel:

> FDA has concerns over the potential of Fentanyl Citrate, the active ingredient in
> [FENTORA], to form a new salt, mainly Fentanyl Glycolate salt.  The concern is
> that FDA believes that the pH environment during wet granulation has the
> potential to trigger the formation of Fentanyl Glycolate salt.

*          *          *

FDA requested theoretical and experimental data ASAP.  Watson then asked FDA
what they considered "appropriate" data.  FDA replied Watson must demonstrate
final dosage form is still Fentanyl Citrate …. FDA reiterated that the application
will not be accepted until data is provided.

20.     The Contact Report also makes clear that Watson's lead formulator, Hiren

Patel, assured FDA that there was "no chance" that the new salt (fentanyl starch glycolate) would

be formed during the manufacturing process for the Watson drug.

21.     During trial in the patent case, however, Mr. Patel admitted under oath that

neither he nor Watson ever studied whether the inactive ingredient in Watson's product (sodium

starch glycolate) can react with FENTORA's active ingredient (fentanyl citrate) to form a new

complex.  And Watson's lead analytical chemist, Dimitry Zelenyuk, confirmed that Watson had

not tested and therefore did not know whether FENTORA's active ingredient (fentanyl citrate)

reacts with the inactive ingredient in Watson's product (sodium starch glycolate) during

Watson's manufacturing process.

22.     The assurances given by Mr. Patel were the only evidence on this issue that

Watson produced during lengthy discovery in the patent lawsuit.  Cephalon is unaware of any

experimental data or other form of testing on the final dosage form that Watson provided to FDA

to show that its product does not contain a new fentanyl salt.  Although Watson's records show

that FDA requested such data, there is no indication in the court record from the patent case, and

no indication from FDA's citizen petition response, that Watson ever provided FDA with the data

needed to make an informed decision on whether the proposed generic contains only the same

form of the active ingredient as the approved brand name drug.

8

4. **Cephalon's Citizen Petitions**

23.     Promptly after receiving Watson's permission to disclose some of the
information that had previously been designated as subject to a protective order in the patent
lawsuit, Cephalon submitted a Citizen Petition to FDA on July 13, 2010 (the "Salt Citizen
Petition"). The Salt Citizen Petition provided FDA with summaries of Cephalon's test data
demonstrating that Watson's product contains the new fentanyl salt. The Salt Citizen Petition
also attached the trial testimony of the Watson personnel that conflicted with the assurances they
had given FDA. In the petition, Cephalon reminded FDA that based on the agency's own
interpretation of the FDCA, a different fentanyl salt should not be considered as the "same active
ingredient" as that present in FENTORA. Cephalon asked FDA to withdraw its acceptance of
the Watson ANDA and/or reject the ANDA. On October 4, 2010, after receiving permission
from the Delaware Court to provide FDA with additional previously-confidential Watson
information, Cephalon submitted a supplement to the Salt Citizen Petition.

24.     On July 23, 2010, Cephalon submitted a second Citizen Petition (the "BE
Citizen Petition") asking FDA to revise its bioequivalence guidelines to ensure that generic
versions of FENTORA are bioequivalent to the innovator product. Specifically, Cephalon
requested FDA to require sponsors of generic FENTORA products to demonstrate equivalence
as a function of time, including, for example, measuring the extent of absorption at 30 minutes
and/or the rate of absorption at 30 minutes. Because FENTORA is approved to provide rapid
relief for a condition that must be treated within thirty minutes, the agency must require testing
to ensure that proposed generic versions of FENTORA provide similar rapid relief (*i.e.*, within
thirty minutes) before they can be deemed to be bioequivalent.

25.    On January 7, 2011, FDA approved Watson's ANDA and issued final

decisions in response to Cephalon's Citizen Petitions.

**5.  FDA's Response to The Salt Citizen Petition:**

26.    In denying Cephalon's Salt Citizen Petition, the agency did not refute that

the fentanyl salt constitutes a new "active ingredient." Instead, FDA asserted that the agency had

concluded that "the risk for the conversion of the citrate sale to the sodium starch glycolate salt

during the wet granulation process used by Watson is at an acceptable minimum and would have

no affect on product performance, including safety and efficacy." Petition Response at 6. If

FDA's position is that there is low risk of the different salt forming in Watson's process, it is

unquestionably wrong – there is no such evidence in the record, and all the available science

shows that the different salt does form in Watson's process. If FDA's position is that the

different salt poses no risk, it is a clear violation of the FDCA, which categorically prohibits the

agency from approving an ANDA unless the applicant has demonstrated that the product has the

"same active ingredient." 21 U.S.C. § 355(j)(2)(A)(ii)(I).

27.    The agency's acceptance of the existence of a different active ingredient in

Watson's product from the one contained in FENTORA is impermissible. The FDCA's

requirement that a generic version of an approved drug contain the identical active ingredient –

and only that active ingredient – is clear and unambiguous. As a matter of law, it does not matter

whether there is any "demonstrated effect" on product performance; the presence of fentanyl

starch glycolate in Watson's product is per se impermissible under the provision of law

governing the approval of generic drugs. See 21 U.S.C. § 355(j)(4)(C)(i); 21 C.F.R.

§ 314.127(a)(3)(i) (requiring FDA to not approve an ANDA if the information submitted in the

application is insufficient to show that the active ingredient is the same as that of the approved drug).

28.    Even assuming that FDA intended to suggest that the "risk" of the salt being created  (rather than the amount of such salt) was at an "acceptable minimum," there is no evidence in the record for the Citizen Petition proceeding to support that finding.  Indeed, there is nothing in the record to support any findings or conclusions about the probability of salt conversion other than the evidence supplied by Cephalon that the salt actually is created.  FDA's assertion also ignores that if a salt conversion were to occur, the effects of such conversion could be catastrophic.

29.    The FDCA expressly prohibits FDA from approving an ANDA unless the proposed generic product contains the same active ingredient as the pioneer drug.  Watson's product contains a new fentanyl salt not present in FENTORA.  Under FDA's regulations, different salts of an active moiety are not pharmaceutical equivalents; they are considered to be different active ingredients.  21 C.F.R. § 320.1(c) ("Pharmaceutical equivalents means drug products in identical dosage forms that contain identical amounts of the identical active drug ingredient, i.e., the same salt or ester of the same therapeutic moiety") (emphasis added).

30.    FDA made this point clear in the context of a different Citizen Petition Response, where it said:

> Different salts and esters of the same therapeutic moiety are regarded as different active ingredients because they have different chemical structures and, quite often, different adverse event profiles.

Ceftin Citizen Petition Response, Docket Nos. 00P-1550 and 01P-0428 (Feb. 15, 2002) at 28 (emphasis added).

31.   Indeed, FDA has said:

[t]he agency interprets the requirement that the active ingredient in the proposed drug product be the same as those of the listed drug to mean that the active ingredients must be identical.  For example, if the proposed drug product contained a different salt or ester of the active ingredient in the listed drug, the active ingredient in the proposed drug product would not be identical to the active ingredient in the listed drug, and could not, therefore, be approved in an ANDA.

54 Fed. Reg. 28872, 28881 (July 10, 1989) (preamble to proposed regulations).

32.   FDA devoted the majority of its Salt Petition response to a critique of one of the studies Cephalon conducted on Watson's manufacturing process that demonstrated the existence of the fentanyl salt in Watson's product.  FDA dismissed this study on two grounds. First, the agency criticized the study because it used only sodium starch glycolate and not the other inactive ingredients used in Watson's product, which according to FDA limit the contact between fentanyl citrate and sodium starch glycolate.  Second, FDA noted that Cephalon's study used "sonication," or ultrasonic energy, to mix the fentanyl citrate and sodium starch glycolate. According to FDA, sonication as a general matter is more powerful than mechanical agitation and so may have been more likely to create an additional salt than the manufacturing process used by Watson.  FDA, however, never considered that the level of sonication can be controlled and varied and quite readily can be adjusted to provide the same level of intensity and energy as mechanical agitation.  The only reference the agency could find to support its position was an article from the textile industry.  FDA failed to find a single reference from the pharmaceutical industry to support its overbroad assertion.  That is, the only citation FDA provided in support of its argument that sonication is too powerful a method for use in Cephalon's earlier study was a 2004 article that concerns the removal of cellulose and other impurities from cotton.  Not one of

12

the article's authors appears to have ever published an article on pharmaceutical manufacturing methods or on the creation or analysis of pharmaceutical polymers. For FDA to dismiss the results of Dr. Mathias's study by relying on a six-year old reference from the textile industry is arbitrary and capricious.

33.     Even more, Cephalon also conducted testing on Watson's final product. This product contained all of Watson's active and inactive ingredients, and the testing results on it were consistent with the presence of fentanyl starch glycolate. As described in the declaration of Lon J. Mathias, which Cephalon submitted to FDA as part of its Citizen Petition, a study was performed using six Watson 0.8 mg tablets obtained in discovery during patent litigation between Cephalon and Watson. Dr. Mathias analyzed the relative amounts of crystalline fentanyl citrate in each of these samples. The data showed that less than 20% of the fentanyl in Watson's tablets – with all of the same active and inactive ingredients – is present as crystalline fentanyl citrate. In denying Cephalon's petition, the agency failed to address this study conducted on Watson's finished product, including all of its active and inactive ingredients. For this reason alone, FDA's denial of the Salt Citizen Petition and its approval of Watson's ANDA cannot stand.

34.     In addition to failing to consider relevant evidence directly related to the "same active ingredient standard," FDA's own analysis suffered from a procedural defect: FDA failed to support its position with reference to the facts or adequate scientific support.

**6.  FDA's Response to The BE Citizen Petition:**

35.     In denying the BE Citizen Petition, FDA has made clear that ANDA sponsors are not required to demonstrate bioequivalence at 30 minutes after the drug is taken by

a patient.  However, breakthrough cancer pain reaches maximal intensity with a median of 3 minutes and has a median duration of 30 minutes.  In the clinical studies FDA accepted in support of the approval of FENTORA, the critical endpoint of the study was the sum of differences in pain intensity scores at 15 and 30 minutes from the start of the pain episode.  This study, as well as other clinical trials that Cephalon has conducted, found that FENTORA begins to have a clinical effect on pain in as little as 15 minutes post-dose, and that the clinical benefit of FENTORA continues to increase through 30 minutes.

36.     Because rapid analgesic effect is a critical aspect of FENTORA, proposed generic versions of the drug must be tested to demonstrate a similar rate and extent of absorption at an early interval.  FDA has acknowledged this very fact in one of its own guidance documents:

> For orally administered immediate-release drug products, BE can generally be demonstrated by measurements of peak and total exposure.  An early exposure measure may be informative on the basis of appropriate clinical efficacy/safety trials and/or pharmacokinetic/pharmacodynamic studies that call for better control of drug absorption into the system circulation (e.g., to ensure rapid onset of an analgesic effect or to avoid an excessive hypotensive action of an antihypertensive).  In this setting, the guidance recommends use of partial AUC as an early exposure measure.

37.     Similarly, in its Draft BE Guidance for another drug, extended-release zolpidem tartrate (Zolpidem), FDA left no doubt that alternative BE parameters must be required when those parameters correspond to clinically significant characteristics of the pioneer drug.  The Zolpidem precedent is especially significant because it shows that FDA will consider early exposure measures to demonstrate BE where there is a strong association between the clinical effect of the product at well defined points in time.

38.     In its petition response, FDA attempted to distinguish the Zolpidem precedent from the present case.  In a single paragraph, the agency announced an entirely new

14

legal and scientific standard for bioequivalence, and then sought to explain why Zolpidem was not held to this standard.  In short, it appears that FDA is saying that innovator drugs must undergo exacting PK/PD studies before the agency will require early exposure parameters for generic versions of those drugs, but that drugs such as Zolpidem – which do not result in tolerance or require titration – are exempt from this newly articulated requirement.  In making this pronouncement, the agency arrived at the remarkable and legally unsupported conclusion that it will impose more exacting BE standards for generic insomnia drugs than it will for potent opioid painkillers.  Despite FDA's pronouncement, there is nothing in the statute that exempts generic products from meeting the bioequivalence standard in cases where the innovator drug must be titrated or where the drug results in patient tolerance.  21 U.S.C. § 355(j)(2)(A)(iv).

39.    FDA also wrongly suggested that because different formulations of FENTORA are not bioequivalent to each other, generic versions of it need not be either.  This assertion runs afoul of the bioequivalence requirement set forth in the FDCA.

**7.  The Need for Prompt Judicial Intervention:**

40.    Watson currently is barred from bringing its product to market by an injunction that was issued in a separate patent case filed by Cephalon in the District Court for Delaware.  However, the patent court recently ruled in Watson's favor on two of the three patents and is expected to rule imminently on the remaining patent at issue.  If the patent case is resolved in Watson's favor, Cephalon will be forced to solicit this Court's assistance in issuing a TRO and PI to prevent Watson from bringing its drug to market before resolution of the administrative law issues raised in this case.

41.     Unless FDA's conduct is enjoined by this Court, the public will suffer severe and irreparable harm.  The public's interest is particularly keen in this case because, barring an injunction, FDA's actions will usher into the marketplace a generic drug of untested safety and efficacy.  A fentanyl buccal tablet that does not have the same active ingredient as the reference product is not a "generic version" of that product at all, and provides no assurances that it will function as effectively or safely as the pioneer drug—which has been the subject of numerous clinical studies demonstrating its safety and effectiveness when used in accordance with its labeling.

42.     A review of FDA's website and the agency's Approved Drug Products with Therapeutic Equivalence Evaluations database makes clear that there are currently no approved products that contain the new fentanyl salt as an active ingredient.  In other words, FDA has never determined that this form of fentanyl is safe and effective for the treatment of any indication.

43.     While the presence of a new, untested salt would be a concern no matter the drug at issue, the concern is heightened here, because the drug at issue is fentanyl.  Fentanyl is a powerful opioid analgesic that is regulated as a Schedule II narcotic.  The FDA-approved FENTORA package insert contains the following Black Box Warning, strongly cautioning against the substitution of FENTORA for other fentanyl products:

> When dispensing, do not substitute a FENTORA prescription for other fentanyl products.  Substantial differences exist in the pharmacokinetic profile of FENTORA compared to other fentanyl products that result in clinically important differences in the extent of absorption of fentanyl.  As a result of these differences, the substitution of FENTORA for any other fentanyl product may result in fatal overdose.

44.   Watson's product could be available in the market immediately after the patent court issues its ruling on the third patent or otherwise lifts the temporary injunction, and when Watson's product becomes available, it will be immediately dispensed.  Because generics are thought (and required) to be identical to the innovator drugs they reference, a number of managed care organizations and many state laws mandate the automatic substitution of generic drugs for innovator products, regardless of whether the physician specifically prescribes the branded product.  That will be so here, because approval of Watson's product as a generic will signal, erroneously, that it contains the identical active ingredient as FENTORA.  Consequently, Watson's product will be automatically substituted for FENTORA by pharmacists around the country, even though the "generic version" contains an active ingredient not found in FENTORA.

45.   Barring an injunction, then, FDA's actions will usher into the marketplace a new drug of untested safety and efficacy.  A fentanyl buccal tablet that does not have the same active ingredient as the reference product is not a "generic version" of that product at all, and provides no assurances that it will function as effectively or safely as the pioneer drug— which has been the subject of numerous preclinical and clinical studies demonstrating its safety and effectiveness when used in accordance with its labeling.

46.   These safety risks are not merely hypothetical.  If a patient takes a generic fentanyl buccal tablet and does not experience adequate pain relief, that patient may feel compelled to take a second tablet.  If the generic product has a slow rate of rise and if two tablets are taken, the patient could risk an overdose with potentially fatal outcomes when both tablets reach their peak concentration.  This risk is magnified in situations where a patient is switched

17

from the innovator to the generic product. If a patient is accustomed to pain relief within a certain timeframe with FENTORA, and is then switched to a slower acting generic product, the patient could take a second dose of the generic not realizing that the first dose simply has not started to have an effect.

47.     While the harm to the public is the overriding consideration here, Cephalon also is likely to suffer severe harm absent injunctive relief from this Court. Patients may suffer significant side effects and potential overdose while taking Watson's product, even though they believe they are taking the FENTORA their doctor prescribed. Further, if Watson's product is insufficiently efficacious, cancer patients receiving that product will not experience a suitable level of relief from their breakthrough pain episodes. FENTORA will thus be wrongly associated with bad outcomes, causing irreparable damage to FENTORA's reputation, as well as the reputation of its maker, Cephalon. Indeed, the reputation of the company as a whole will suffer.

48.     The harm caused by Watson's faulty product would severely undermine FENTORA's (and therefore Cephalon's) reputation even in the absence of patient confusion. As an approved "generic version" of FENTORA, Watson's product will be held out to patients and physicians as identical to FENTORA in active ingredient and fully equivalent in terms of safety and effectiveness. As a result, patients will assume that any side effects they experience with Watson's "generic version" are also associated with FENTORA, thus harming FENTORA's (and Cephalon's) reputation. Similarly, if a prescribing physician begins to receive complaints from patients concerning the side effects of the putative "generic version," he or she is likely to turn away from prescribing FENTORA on the mistaken assumption that the two are identical.

49.     Cephalon also will suffer another form of severe irreparable harm absent an order enjoining, suspending, and/or vacating FDA's approval of Watson's product – rapid and significant erosion of sales that cannot be recouped from FDA.

## CLAIMS FOR RELIEF

### Count I
### (Administrative Procedure Act:  Violation of the FDCA and Applicable Regulations)

50.     Cephalon realleges, reasserts, and incorporates by reference herein each of the allegations contained in paragraphs 1 through 49 of the Complaint as though set forth fully herein.

51.     FDA's acceptance for filing and/or approval of Watson's ANDA and its rejection of Cephalon's Citizen Petitions was unlawful and in violation of the FDCA and the agency's own regulations, policies and procedures.

52.     FDA's acceptance for filing and/or approval of Watson's ANDA and its rejection of Cephalon's Citizen Petitions constitutes final agency action for which Cephalon has no other adequate remedy within the meaning of 5 U.S.C. § 704.

53.     FDA's acceptance for filing and/or approval of Watson's ANDA and its rejection of Cephalon's Citizen Petitions was not in accordance with federal law and therefore violates 5 U.S.C. § 706(2)(A).

54.     FDA's acceptance for filing and/or approval of Watson's ANDA and its rejection of Cephalon's Citizen Petitions constitutes agency action in excess of statutory jurisdiction, authority, or limitations, or short of statutory right, in violation of 5 U.S.C. § 706(2)(C).

19

55.     Both Cephalon and the patient population will be irreparably harmed unless FDA's approval of Watson's ANDA and rejection of Cephalon's Citizen Petitions is vacated.

56.     There is no mechanism by which Cephalon can be made whole for the injury that would result from the entry into the marketplace of Watson's generic drug.

57.     Both the public interest and the public policy underlying the FDCA will be served by an Order vacating FDA's approval of Watson's ANDA and rejection of Cephalon's Citizen Petitions.

### Count II
### (Administrative Procedure Act:  FDA's Conduct Was Arbitrary, Capricious, an Abuse of Discretion and Contrary to Law)

58.     Cephalon realleges, reasserts, and incorporates by reference herein each of the allegations contained in paragraphs 1 through 57 of the Complaint, as though set forth fully herein.

59.     The APA prohibits FDA from implementing the FDCA in a manner that is arbitrary, capricious, or an abuse of discretion.  5 U.S.C. § 706(2)(A).

60.      FDA's acceptance for filing and/or approval of Watson's ANDA and its rejection of Cephalon's Citizen Petitions was not based on reasoned decision or rational basis, and therefore was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

61.      FDA's acceptance for filing and/or approval of Watson's ANDA and its rejection of Cephalon's Citizen Petitions was premised on agency determinations that represented abrupt departures from long-standing agency practice and the treatment of similarly-

situated entities differently.  FDA's conduct there was arbitrary, capricious, an abuse of

discretion and otherwise not in accordance with law in violation of 5 U.S.C. § 706(2)(A).

62.    FDA's acceptance for filing and/or approval of Watson's ANDA and its

rejection of Cephalon's Citizen Petitions constitutes final agency action for which Cephalon has

no other adequate remedy within the meaning of 5 U.S.C. § 704.

63.    Both Cephalon and the patient population will be irreparably harmed unless

this Court vacates FDA's approval of Watson's ANDA and rejection of Cephalon's Citizen

Petitions.

64.    There is no mechanism by which Cephalon can be made whole for the

injury that would result from the entry into the marketplace of Watson's product. Cephalon is

without an adequate remedy at law because of the unique nature of the harm.

65.    Both the public interest and the public policy underlying the FDCA will be

served by an Order vacating FDA's approval of Watson's ANDA and rejection of Cephalon's

Citizen Petitions.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully prays for the following relief:

A.  A declaration pursuant to 28 U.S.C. § 2201 that FDA's acceptance for filing and/or

approval of the Watson ANDA and its rejection of Cephalon's Citizen Petitions was arbitrary,

capricious and unlawful under the APA and the FDCA;

B.  Temporary, preliminary and permanent injunctive relief suspending, enjoining and/or

vacating FDA's approval of the ANDA submitted by Watson and its rejection of Cephalon's

Citizen Petitions;

C.  A final order vacating FDA's approval of the ANDA submitted by Watson and its rejection of Cephalon's Citizen Petitions;

D.  Remand to FDA requiring the agency to take action consistent with the foregoing;

E.  An order awarding plaintiff's costs, expenses and attorneys fees pursuant to 28 U.S.C. § 2412; and/or

F.  Such other and further relief as the Court deems just and proper.

Respectfully submitted,

*Jonathan Abram/sc*

HOGAN LOVELLS US LLP
Jonathan L. Abram
Susan M. Cook
555 Thirteenth Street, N.W.
Washington DC 20004-1109
Telephone: (202) 637-5600
Facsimile: (202)637-5910
jonathan.abram@hoganlovells.com
susan.cook@hoganlovells.com

Attorneys for Plaintiff Cephalon, Inc.

Dated:  March 15, 2011